Our next case for argument this morning is Marissa Darlingh v. Adria Maddaleni et al. Marissa Darlingh was fired for a short speech she gave at a political rally on her own time on a critically important and hotly debated topic of the day. Now, in the passion of the moment, she used the F-word multiple times, something she has acknowledged went too far and has offered to apologize for. But the process defendants followed, and the reason they ultimately gave for firing her, strongly suggests that they really fired her for the viewpoint that she expressed. They didn't have any conversation with her before initiating the disciplinary process. They didn't listen to anything she said during that process. They refused to even tell her how, in their view, she had violated any policy. And the main reason they ultimately gave is transparently pretextual, since it's directly contradicted by multiple things that she said in the record. Now, the legal question before this court. Speaking of things that she said, Mr. Burke, on page 23 of your brief, you allege that Miss Darlingh was speaking at the rally generally about the fact that, and I'll quote, to the extent it was in her control, she would not be the initiator or cause of a student's social or medical transition, end quote. Where in her speech did she say the part about to the extent it was in her control, and where would you say the part was where she said she would not be the initiator or cause of a student's transition? So she said, on my watch, no student will socially transition or medically transition. But remember, this was an off-the-cuff, unscripted speech. She wasn't planning to speak, as she even said during the speech. And it was an emotional rally. She had been sworn at that entire morning. And so she was speaking off the cuff. And as she has later clarified what she was intending to say, and this is undisputed in the case. She has a declaration in the case that is undisputed saying this. What she was intending to say, trying to say, although didn't say it in the best way as she acknowledges, was that she would not be the cause of a transition. But she has told the district repeatedly that she would use students' names and pronouns. She would follow the parents' lead as to students' names and pronouns. And she asked the district specifically if the policy requires something else. Please explain. I want to adjust my behavior to match your policy. But is the school entitled to take her words at the rally at face value? No, I think it's not reasonable for the school district to use what she said on her own time out of school as a gotcha moment. And then ignore everything that she says after the fact and everything that she told the district. And again, she told the district repeatedly that she would use students' names and pronouns. She would follow the parents' lead. And yet the termination letter, the primary reason that the school district gave for firing her, was said, you refuse to use students' names and pronouns. And that's directly contradicted by what she said. And I just think that suggests that this was pretext for their disagreement with her viewpoint. Mr. Berg. I'm sorry. I'm sorry. Mr. Berg, are there any or were at the time of this incident, were there any, was there any guidance or regulations as to how, where, or when a member of the faculty could speak about matters pertinent to the educational process? No, there's no policy that prevents school district employees from participating in the political process. In fact, their policy encourages it. How does it do that? I forget the exact site, but there's a spot in the policy that says explicitly that public employees are encouraged to participate in the political process. The defendants haven't pointed to any policy that she violated simply by speaking as a part of a political rally. And I think the lesson of pickering is that citizens don't lose their right to speak in the political process merely by becoming a public employee. But in her situation, she was pretty much left on her own to do the pickering balance herself and adjudicate for herself which side of the line she fell on. She had no guidance from her employer as to what they considered to be a professional matter to be discussed in-house and what was a permissible expression of public interest. That's right, Your Honor. There was no clear policy that she violated by speaking during this rally. And if they believed there was some policy, the reasonable thing to do would have been to have a conversation with her, talk with her in a room and say, you know, we think this violated X, Y, and Z. And they never had that conversation. And when she asked for the basis for the disciplinary letter, they refused to tell her what the basis for the letter was. And then when they ultimately fired her, the main reason they gave was you refused to use the names and pronouns of transgender students. And, in fact, she said the exact opposite during the disciplinary process. So they clearly weren't listening to what she said. And I think all of this suggests that the termination was pretext for disagreement with her viewpoint. Now, you argue this on both First Amendment grants and due process grants. Am I correct? We brought both of those claims below. The only claim before this court is the First Amendment claim. That's what I thought. But many of the things you've just talked about seem to me to be more questions of fairness, of due process, of how they went about adjudicating. Well, I think it goes to the pretext question, Your Honor. The fact that they wouldn't tell her what she was being investigated for, the fact that they wouldn't have a conversation with her in advance, and the fact that they ignored everything she said strongly suggests that they ultimately were firing her, not because she refused to use students' names and pronouns because she didn't refuse. She said that she would. And there's no evidence that she ever didn't. It strongly suggests that this was pretext for disagreement with her viewpoint. And that is expressly forbidden by the Constitution. And I just think the lesson from Pickering and its progeny is that when First Amendment concerns are at play, government employers have to engage in a reasonable process. They have to go through the disciplinary process in good faith. And they didn't here. Even if she did offer a full retraction and apology, and I have to tell you, I think that what has occurred here is well shy of that. Hasn't the damage and disruption already occurred? And, I mean, do you think the school had reason to be concerned about what she might say to a student who came to her in a role as a counselor because they had questions about their gender identity? Certainly, I think it was reasonable for the school district to have some concern, to have a conversation with her, to do an investigation. But what she told them in the disciplinary process was, I have and always will treat all children equally who are under my care, including transgender students. She said, I will use their names and pronouns. I will follow the parents' lead. What I was attempting to communicate was in opposition to an ideology, particularly the medicalization of transgender children. And that's not an issue that the school district even has a policy on. So she wasn't even directly commenting on any school district policy or decision. She was attempting to comment on what I think what all would agree is an incredibly significant and important topic of the day. And the school district summarily fired her for you in her speech. To make that she was, in effect, saying this is a matter for the child and the parents, not for the school system. Did she actually, what's the best language you've got in what she said to support that view? She said, I oppose gender ideology entering the school district. And there's no policy that requires her to teach gender ideology. But there are lots of stories that have been widely reported about educators and teachers taking the view that it is their job to teach young children about gender ideology and to transition children. In fact, I was before this court a couple of months ago on one of those cases. So she was commenting on that. She was saying, I am an educator and I disagree with this idea that we should be teaching children this and that we should be transitioning children. What's the this? Teaching children this? Gender ideology, this idea that if you experience some discomfort with your body, it must mean that you were trapped in the wrong. So it's a moral question that she would put in the same category as religion. We don't talk about religion in public schools. It's a matter for home. Yes. This is a matter of moral, a profound question of morality. We don't talk about that in school. This is a matter for home. Yes, Your Honor. And I think that that example is a perfect analogy. If she had commented on religion in schools publicly, she has a right to do that under the First Amendment. And she couldn't be fired for that either. I see that my time is up. So I'll sit down. Thank you. Before you do, I have a question about what I consider to be the most difficult part of this case. And that is the statements in Ms. Darling's speech at the rally that appear to commit her to not supporting a social transition if her students requested that support. Medical transition is something separate. She spoke about that too, but these are elementary school kids. So let's talk about the social transition. That's the likeliest context in which the issue would arise in the course of her work. And if that's the focus of the discipline here, that there was a fundamental incompatibility between what she said about how she would approach a student who expressed an interest in social transition or even questioning that process. Her professed commitment to not support that conflicts with her obligations as a guidance counselor at the school, just irreconcilably, and justified the harsh remedy of termination. I think what she has explained she was trying to say is, on my watch, if I am the one in charge of the students for the day, I'm not going to initiate a social transition. Some teachers around the country are doing that. There's a case in the Northeast where a teacher gave a child a breast finder without the parent's awareness of it. So she's saying, I'm not going to be the one to make that decision to do that for a child. But of course, of course, if the student transitions outside of the school district and that's what the parents want, I will follow the parent's lead and I will use the student's name and pronoun. She said that repeatedly to the school district in at least five different places. In her defense against termination, that's not contextually even the impression that her speech left with listeners. And any member of the school community who accessed that YouTube, that message that came through later would be lost. Yeah, I think in the context of the speech, it might have been reasonable for the school district to say, we're concerned that you're going to not even use names and pronouns. So it was totally reasonable for them to engage in an investigation. It would be reasonable for them to talk to her about that. But it became unreasonable after the disciplinary process when she said, I will follow your policy, absolutely. I'm explaining what I was trying to say. I said it in a way that I acknowledge was inappropriate. But what I was trying to say was this. Here is what I meant. And then for them to ignore everything she said after the fact and say, it doesn't matter what you say after the fact. We're going to fire you because you refuse to use names and pronouns. When she said, I will. I will use names and pronouns. And if your policy requires something different, please let me know. Again, let me just, forgive me, but isn't the school entitled to take her words at the rally at face value? I think it's the classic question of which time was she telling the truth, when she was at the rally or in retrospect? And, you know, they wrote a lot to her trying to explain their position. It's not like they just said, you're fired. That did not occur here. I mean, they wrote numerous things to her about why. Your Honor, I think the First Amendment requires a reasonable process by the school district. It is unreasonable for them to ignore everything she said to them after the fact. And the Supreme Court in Rankin, in fact, emphasized that when there's a dispute about what a person meant, it matters. And courts need to make factual findings about that. So I just think to protect the constitutional right of employees, the government has to be reasonable. And it was not reasonable when they just completely ignored everything she said after the fact. Thank you. Thank you. Ms. Headley. May it please the court. Good morning. Catherine Headley on behalf of the Milwaukee Board of School Directors and named defendant Appellees before you today, who are requesting that this court affirm the decision in order of the district court, which held that or which determined, which dismissed the case in defendant's favor and also denied the motion for preliminary injunction. At the outset, I do want to just briefly discuss that the case as in establishing the briefs focused on the pickering factors. To briefly address the due process questions that just came up from counsel, Ms. Darling was provided the due process necessary. She was given a series of policy violations, eight, in fact, and was presented with the information as the as the employer developed it and then was given an opportunity to respond. I also want to just briefly identify Ms. Darling's words repeatedly as counsel identified were that she was not going to, over her dead body, allow for a social or medical transition of a child. The terminology that counsel uses is his words. In fact, if you look at Exhibit 12, that's connected to the plaintiff's or the appellant's brief. It identifies a series of 50 different exhibits that were at the hearing that the hearing for termination and specifically identifies Exhibit 11, which included a compilation of videos that took place after the initial speech in April. I want to make that clear. The speech took place in April. DPI launched an investigation, which prompted Ms. Darling to go on the, I don't want to say the offensive in a negative way here, but to go to preemptively identify that, no, I was correct. She went on Fox News. She identified, she had the article with Milwaukee Journal Sentinel. All of that to say she was asked on Fox News specifically, would you change anything about what you said or how you said it at the rally? And her response was no. All of that was laid clear before the decision maker for the school board and also was part of the context with which the school board had to review the response. Of course, the district court has not definitively adjudicated the due process case. Is that right? Absolutely. Really, the district court hasn't definitively determined the First Amendment matter either, has it? Or she, whoever the district court was. The district court, in its discretion, reviewed the seven pickering factors and determined that it weighed in favor of the defendant appellee in this case. Denied an injunction. It denied the injunction and also granted the defendant's motion to dismiss based upon that same analysis. But it is possible we could affirm this district judge on the denial of the injunction. But tell her he's got to take another look at it in terms of the dismissal. That is within the realm of possibility here. In fact, we could say we have no jurisdiction over that dismissal. Correct. I mean, this court could do that. I think that for purposes of judicial economy, that would not make much sense. If you look at the reason behind the denial for the injunction, it was on that first factor of the ability for the likelihood of success on the merits, which is where they focused the pickering on. So if this court decides to affirm the basis of the injunction but reverse for purposes of developing a more full record, I don't think that's necessary here for, like I said, for purposes of pickering. Here's my – let me tell you my problem with the case and why I think that might be something we ought to at least consider. These folks, these teachers in the public school system, they certainly have a lot to contribute to the public dialogue on these very thorny issues. At the same time, it's clear that we can't have them impeaching their effectiveness in the classroom or impeding the deliberative process of the school district. Well, where do we draw the line? How do we draw the line? That's why I asked your colleague if you folks had issued anything in the way of guidance to these professional people to teaching the kids. And his answer is no. You know, you haven't given these yet. You'd never told this woman, you can do this, but you can't do that. Have courts across the nation been drawing this line? That's something these briefs really don't tell us. Where have courts across the nation been telling Ms. So-and-so, the guidance counselor for the fifth grade students, what she can do and can't do? I mean, that's governance. That's what's got to happen. What have the courts across the country been saying about that? Well, if – I don't know. I can't write a treaty saying what the courts across the country are saying on this. See, that's one of the problems we have on this court is that although there's no attribute of sovereignty in a circuit, counsel very often are very narrow in their presentation of the law to us. This is a federal law question, and I'm kind of interested in what the judges in Tennessee and the judges in Utah might say about this. Well, what I will say is that I do know that this court in Craig relied upon a court in New York, Melzer, I believe, M-E-L-Z-E-R, similar kind of standards here with positions of power, positions of trust, and identified that these people, while I, as a government employee myself, I enjoy First Amendment freedoms as well, but there is a limit when those freedoms then violate the school board policy. So I do want to push back to say you're correct, Judge. There is no specific policy. Thou shall not say X. That's the first, second time this morning we've heard pushback, which I think is not really a good word to use in a dialogue in a court. That's for the other branches. But might I say something? You know, this was a preliminary injunction, which we review only on abuse of discretion. And Magistrate Dries, he actually gave her the benefit of the doubt. He took the facts in a light favorable to her, and that is not the standard at a preliminary injunction hearing. But I would like also, could the school have terminated her for her foul language alone, in combination with identifying herself as a school counselor, do you think? It's hard to parse that out because of where the foul language occurred, Your Honor. And what I mean by that is the foul language wasn't just the expletive on its own. It was specifically directed at an ideology, at a theory, and at the advancing of youth in transitioning, right? So I equate that to say this. If Ms. Starling were to be an anti-desegregationist, we'll say that, and she went on to say, you know, over my dead body will black and white students be educated together, this court would have no problem identifying that that is an inappropriate use, and specifically not to ruffle this court, not to disparage this court, but the terminology that she used here, on my dead expletive body, will my students be exposed to the harm of gender identity ideology? Not a single one of my students on my expletive watch will ever transition socially, insured as hell, not medically. So if we were to change out that with any other protected basis, this wouldn't be a question. Or if it would be a question, it would be a very easily identifiable and readily dismissible question for this court to do. See, I was very surprised, to be perfectly honest, that the city didn't dispute the district court's finding about factor four of McQueen. Because my thought, you know, as to the manner of the speech, because my thought was that the school district could have fired her for her manner of speech alone. In other words, I am a school counselor, and then using the vulgar, the incredibly vulgar language, which would leave to my thought, not even a scintilla of doubt about where she stands on this issue. And yet, the city did not disagree about factor four, or the school district, or whatever. Respectfully, Judge, I didn't draft the brief. And so if I had drafted the brief, I probably would have pushed back on element four specifically for that point. However, I think that the way my colleague had drafted it focused, even conceding number four, even conceding the fourth element, there's still four more that are plainly in the favor of the district. Yeah, well, one, two, three, and seven, heavily. Correct. It would fall, you know, to my view, in favor of the school district. All right. Thank you. Thank you. What is the primary school district interest that's being advanced here as the justification for the termination? It's not the foul language. Evidently, we've just established that, although you might have seen things differently than your colleague who wrote the brief. But that's not what the school district focused on, or at least not primarily, as a justification for the termination. Perhaps it could have by saying that is disqualifying for a guidance counselor. I don't know, but that's not the focus here. It's Ms. Darling's positions on transgender ideology that she expressed at the rally in her speech and the connection that she made between those views and her work as a guidance counselor. Correct. So she, again, to go back to the beginning of her impromptu speech, she identified herself by name, by occupation, and specifically by employer. So she directly tied the rest of what she said to her employment in that specific position. The policies that MPS has identified go to the threatening, harassing, intimidating, and generally bullying behaviors. And again, I'll point to the Exhibit 12, which is connected to the complaint, which again goes to the reason that the court could determine this on the motion to dismiss, was because it was all-encompassing. So while generally I agree that the development of the record would be beneficial, and if this court so chooses to reverse and remand on that aspect of it to develop the record more fully, I anticipate there being even more documents and even more statements of Ms. Darling which yield more evidence towards this policy being directed, this policy being violated rather. The threatening, harassing of students in public. Again, we have to keep in mind here, and I do realize I'm out of time and I don't mean to be speaking too much, but we have to realize that this is a public school system, and there are several stakeholders at fact, the students who are being taught or being led by the counselor, the parents who are interfacing with the teachers and the counselors, other teachers who are working with these same students to try to build them up and educate these students. So we have myriad factors at play here, and she's critical in this position of guidance counselor in that position. But just confirming, there is no school district or school-based policy about dealing with transgender students? We have guidance. Again, that is included. I didn't pull that, and I can pull that from the appellate record from the complaint itself. There is guidance, and it's been from 2016 or 2017 as to how to engage with transgendered students, readily available on MPS's website. Do you think we need a policy for teachers or counselors to know that they should not stand up in front of a crowd, identify themselves as a public employee, and maintain that under no circumstance will they follow their employer's policies, be they regarding transgenderism or Muslim children being allowed to pray or teaching American history to include slavery? Do you need an actual policy in your view? Your Honor, I think that policy would be common sense, and no, to answer your question. And it ties back exactly to being insubordinate and not following and not doing the job that was expected of her or of any teacher in that capacity. My difficulty with that answer is Pickering. Correct. Pickering asks the teacher to do this balancing test that we're supposed to do, too. That's kind of like what we used to call maybe a night cat shot. You know, you push a guy off a catapult on a carrier, and it's 360 degrees dark in front of him. Isn't the teacher in that situation? I don't believe so for a couple different reasons. Initially, this court is tasked, and the court below it was tasked with the Pickering balancing test. The employer is not tasked with that, and the employee is not tasked with that either. What the employer is tasked with is ensuring that the employee follow its policies and follow its procedures and follow what they have reasonably expected the employee to do. To that end, again, if her speech had touched on any other different, again, race, had her speech touched on that, this would be easy for the court to determine. We understand that this is a hot bucket. Suppose she had spoken in favor of gender transition. Again, that brings it back to the Pickering balancing factors then. So within the Pickering balancing factors, would there be a disruption in the workplace? Would there be disharmony amongst her coworkers? And how would you answer that question? Applying the Pickering balancing test, which really isn't, you know, check all the boxes. It's whether the justifications of the school district for the discipline imposed outweigh the public employee's free speech interests in speaking as a private citizen on a matter of public concern. So if I understand your question, Judge Lex, you're asking if it's… Well, that Judge Ripple offered, and if the script were flipped and she had expressed a conforming view instead of a dissenting view to the transgender debate as it exists now, how would that balance be struck, the Pickering balance? I think the court would balance it, again, using the same factors. So would there be discord amongst her fellow coworkers? And we didn't have any of that here. We did have discord here, but if the alternative… By another teacher who stirred the pot, which brings in the heckler's veto. Sure. It's the obligation of the government to control the hecklers, not suppress the speech. Correct. If we're going to look at the heckler's veto aspect of it, though, I think that that's inapplicable here for a couple different reasons. One, the heckler's veto doesn't stop an individual from reacting to the speech, which is what those teachers were doing. Secondly, there was no prior restraint on her from speaking. She spoke. That's 100% factually accurate here. But just because she spoke doesn't mean she's entitled to consequence-free speech. People are able to react to that. Third, she identified, again, and promoted, self-promoted on national news and on local news these views over and over again, and, again, doubling down and saying, no, I would not change anything that I did. And then fourth, again, because she had self-published, or not self-published, but because she published her own views again, just because the teacher was the catalyst there, I think this is a red herring. The students would be able to find that anyway. But it's readily accessible anyway to the general public, to parents who, again, per this court in Craig, have a stake in what goes on at school. So, and, again, going back to where we stand with the procedure, all of that is included in the exhibits connected to the complaint. We have emails from community members. We have emails from the Milwaukee community members in the LGBTQ community who work directly with the MPS's Gay-Straight Alliances. We have students, in Ms. Darling's own words, who refused to go and do counseling services with her. We have a student who, again, in Ms. Darling's own words, was fearful for engaging in counseling services with her. We have discord amongst the playground. What is a person who holds dissenting views on this issue to do if employed in a school district as a teacher or a guidance counselor? Just keep those views to himself or herself and not express them in any public way? No, just not be insubordinate, not violate the policies of the school, which are, again, equity, justice, inclusion, and not be bullying. I won't deny that this is a hot-button issue and that there is debate amongst many people about it. It would be foolish for me to stand up here and say that there weren't. And it would also be foolish for me to say that the First Amendment, as an employee, stops me from saying that. So public expression of a dissenting view is okay, except when it crosses the line and constitutes bullying or threats or insubordination? It violates the policy. What policy? Again, as indicated in Exhibit 12, we have policies about anti-no-threatening, harassing, bullying, intimidating, engaging in activity that significantly detracts from the school environment, equity policies, and policies against bullying. Those are all included in, and Ms. Darling was trained on, all of those policies. Now, if she had stood up, not identified herself as a school district counselor, and just said, I'm here in the audience, and this is what I think, would that make a difference? Possibly, but that's not what we have before the court today. No, I know it's not. I know it isn't, but I'm, you know. If we want to talk, again, if we want to talk that hypothetical through, she just identified that I have strong opinions about gender identity, ideology. Transitioning, etc. Correct, correct. If she were to say that, that would be a different story, and I don't know if that would violate these policies. If we don't have, over my dead body, none of my students would, I mean, that's the tie, that's the connection. That's the part that makes this a hard case. All right. Thank you. Thank you. Mr. Berg, I think you had used your time, but I'll give you your rebuttal time back, as I have with the previous arguments today. Thank you, Your Honor. What matters, ultimately, is the reason the school district actually gave, not the reason they could have gave, the reason they actually gave. The Supreme Court said that in Kennedy v. Bremerton, and the reason they actually gave is insubordination. You refuse to follow the district's policy, and I admit entirely that if she had said explicitly, she'd stood up and said, the policy says this, I'm a counselor, I'm not going to follow it, that would be a fireball. She didn't say that. What she said is, I'm not going to be the one to cause a transition, and there's no policy, there's no policy that requires her to be the one that causes a transition. The only policy at play that's relevant is this guidance document, and it says that in most cases, remember, she's a teacher of elementary school students, in most cases, the parents are going to be involved because they're young students. And what she clarified is, I will follow the parents' lead. I will use students' names and pronouns and follow the parents' leads, and if your policy requires something different, please let me know. This case isn't about pronouns and names. It's about something quite different. And what they wrote to her is, you make it very clear that you will do everything within your power to prevent students in your building from transitioning or even expressing who they truly are. That is a mischaracterization of what she said in April, and it directly conflicts with what she told them repeatedly during the disciplinary process, that she would, again, follow students' names and pronouns. She would follow the parents' lead on that regard. What she was primarily commenting about was medical transitioning, and there's no policy in the school district that addresses that. She has a right as a teacher to comment on that and to have an opinion on that. So for those reasons, Your Honors, I would urge that you both reverse the denial of the preliminary injunction motion but also the motion to dismiss. Thank you very much. Thanks to all counsel. The case is taken under advisement.